## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

-------------------------------------------------------

| | |
|---|---|
| **UNIVERSAL DELAWARE, INC. d/b/a GAP TRUCK STOP, on behalf of itself and all others similarly situated,** : | |
| : | |
| **Plaintiff** : | **Civil Action No.** |
| : | |
| **v.** : | |
| : | |
| **CERIDIAN CORPORATION and COMDATA CORPORATION,** : | **JURY TRIAL DEMANDED** |
| : | |
| **Defendants.** : | |
| : | |

-------------------------------------------------------

### CLASS ACTION COMPLAINT

Plaintiff alleges as follows based upon personal knowledge as to matters relating to itself, and upon information and belief as to all other matters:

### NATURE OF THE CASE

1.     Plaintiff, like the members of the class it seeks to represent, is an owner-operator of an independent truck stop. The majority of the approximately 3,000 truck stops in the United States are run by independent operators ("Independent Truck Stops" or the "Independents"). The remaining truck stops are owned and/or operated by a small number of national and regional chains ("Chain Truck Stops" or the "Chains").

2.     Trucking companies contract with third parties to provide truck drivers with fleet payment cards ("Trucker Fleet Cards" or "Fleet Cards") to pay for fuel and other items at truck stops across the country. Defendant Comdata Corporation ("Comdata"), and its parent, Defendant

Ceridian Corporation ("Ceridan") (collectively, "Defendants"), are issuers of Trucker Fleet Cards. Trucker Fleet Cards are processed on point-of-sale transaction ("Trucker Fleet Card POS" or "Fleet Card POS") systems specifically designed to accept and process Trucker Fleet Cards. Comdata owns and operates the dominant truck-stop POS system in the United States.

3.      Trucker Fleet Cards look like consumer credit cards and similarly allow their holders to make purchases without exchanging cash. However, Trucker Fleet Cards provide special benefits to trucking companies that are not available from other payment cards or systems, including the ability to monitor trucker location, fuel usage, and other key data ("data capture"), and the ability to control the items that truckers may purchase with the card ("purchase controls"). These special benefits explain why Trucker Fleet Cards and the Trucker Card POS systems that process those cards compete in markets distinct from other payment systems, including consumer credit cards.

4.      This case arises from Defendants' anticompetitive conduct in the Trucker Fleet Card and the Trucker Fleet Card POS systems markets. Comdata is a monopolist in both markets. As more fully detailed below, Defendants abused this monopoly power by, *inter alia*: (a) programming the dominant Comdata Fleet Card POS systems not to process rival cards or to do so in a way that undermines rivals' ability to compete (for example, by preventing data capture and purchase controls); (b) imposing contractual terms in agreements with Chain Truck Stops that impede competition from rival Fleet Cards, including prohibitions on surcharges and rebates, as well as "most favored nations" clauses; and (c) causing Chain Truck Stops to agree not to accept rival Fleet Cards, including by threatening to impose punitive transaction fees if the Chains were to do so.

5.      Comdata and Ceridian's anticompetitive conduct constitutes an unlawful scheme to acquire and maintain monopoly power in violation of Section 2 of the Sherman Antitrust Act, 15

2

U.S.C. § 2, and agreements in unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Comdata's exclusionary conduct has had the aim and effect of allowing Comdata to maintain and enhance monopoly power and charge supracompetitive prices to Plaintiff and the class of Independent Truck Stops Plaintiff seeks to represent.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this civil action pursuant to 15 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1337.

7.      Venue is proper in this, the Eastern District of Pennsylvania, under 28 U.S.C. § 1391(b) and/or 15 U.S.C. § 22 because (a) Defendants reside, transact business, committed an illegal or tortious act, have an agent, and/or are found in this District, (b) Plaintiff, Universal Delaware, Inc., operates the Gap Truck Stop, located at 54 Route 41, Gap, PA 17527, in this District, and/or (c) a substantial portion of the events described below have been carried out in this District.

## PARTIES

8.      Plaintiff Universal Delaware, Inc. operates the Gap Truck Stop, an Independent Truck Stop, in Lancaster County, Pennsylvania, within the Eastern District of Pennsylvania. During the Class Period defined below, the Gap Truck Stop accepted Trucker Fleet Cards issued by Defendants, paid fees directly to the Defendants, purchased access to Defendants' Fleet Card POS systems directly from Defendants, and was injured by the illegal conduct described herein.

9.      Defendant Comdata is a wholly owned subsidiary of Minneapolis-based defendant Ceridian. Comdata, headquartered in Brentwood, Tennessee, provides custom payment services for a number of industries, including the transportation and trucking industries. The payment services include credit and debit cards, and gift and loyalty cards. Comdata's platforms can support both its

3

proprietary and branded card networks, as well as card processing of all card types.

10.     In 1995, Comdata acquired Trendar Corporation ("Trendar"). Trendar was in the business of providing computerized hardware and software to truck stops for processing sales to their customers throughout the United States. Trendar also provided data collection services to trucking companies throughout the United States. In 1997, Trendar merged into Comdata. Comdata now carries out the business of Trendar. In 1998, Comdata acquired First Data Corporation's NTS transportation services business.

11.     Defendant Ceridian is a multi-billion dollar information services and human resource management company incorporated in Delaware with its principal place of business located at 3311 East Old Shakopee Road, Minneapolis, MN 55425. On information and belief, Ceridian authorized and participated in the conduct complained of herein, and is directly liable for the damages incurred by Plaintiff and the proposed class (defined below).

12.     In addition, Ceridian is both the parent and the alter ego of Comdata and is liable for damages caused by Comdata.

## CLASS ALLEGATIONS

13.     Plaintiff brings this action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of itself and the following class (the "Class"):

> All persons or entities that own Independent Truck Stops in the United States who paid transaction fees for Trucker Fleet Cards directly to Comdata or any of its subsidiaries at any time from March 2003, until the effects of Defendants' anticompetitive conduct cease (the "Class Period"). Excluded from the Class are Defendants and their parents, employees, subsidiaries, and affiliates. Independent Truck Stops include all truck stops except those owned or operated by TravelCenters of America LLC, Pilot Travel Centers LLC, Petro Stopping Centers, LP, Love's Travel Stops & Country Stores, Inc., and/or Flying J, Inc.

4

14.     Members of the Class are so numerous that joinder is impracticable. Plaintiff believes that the Class includes thousands of owners of Independent Truck Stops.

15.     There are numerous questions of law or fact common to the Class, including:

a.      whether the Fleet Card POS systems market and Fleet Card market are the markets relevant to this case;

b.      whether Comdata possesses monopoly power in each of the relevant markets;

c.      whether, through the conduct alleged herein, Comdata willfully acquired, maintained and enhanced its monopoly power over the Trucker Fleet Card POS systems and Trucker Fleet Card markets;

d.      whether Comdata engaged in unlawful exclusionary conduct to impair the opportunities of rivals in the Trucker Fleet Card market;

e.      whether Comdata entered into exclusionary agreements that unreasonably restrained trade in the Trucker Fleet Card POS systems and Trucker Fleet Card markets; and,

f.      whether, and to what extent, Defendants' conduct caused Independent Truck Stops to pay supracompetitive prices and/or fees and, thereby, to suffer antitrust injuries.

16.     These and other common questions of law and fact predominate over any questions affecting only individual Class members.

17.     Plaintiff's claims are typical of the claims of the Class because all Class members suffered antitrust injury in the same way as a result of Defendants' wrongdoing, and the claims of each Class member arise out of the same essential facts and are based on the same legal theories.

5

18.    Plaintiff will fairly and adequately represent and protect the interests of the Class.

19.    Plaintiff has retained counsel experienced in class action antitrust litigation, and Plaintiff has no interest in this litigation that conflicts with the interests of the other members of the Class.

20.    A class action is superior to any other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty for the Court in managing the claims of the Class that would preclude class certification.

## INTERSTATE COMMERCE

21.    During all or part of the Class Period, Defendants offered their products and services to trucking companies and truck stop owners operating in a continuous and uninterrupted flow of commerce across state lines throughout the United States.

22.    At all material times, Defendants conducted business across state lines and sold their services to customers located nationwide.

23.    During all or part of the Class Period, Defendants transmitted funds as well as contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state lines in connection with the use of Defendants' Fleet Card POS systems and Trucker Fleet Cards.

24.    Defendants employed the United States mails and interstate telephone lines, as well as means of interstate travel, in furtherance of their scheme to obtain and maintain monopoly power over the Trucker Fleet Card POS systems and Trucker Fleet Card markets and to restrain trade unreasonably therein.

25.    Defendants' scheme to monopolize the Trucker Fleet Card POS systems and Trucker

6

Fleet Card markets, and to restrain trade unreasonably therein, has substantially affected interstate commerce.

## MONOPOLY POWER / RELEVANT MARKET

26.     Long-haul "over the road" truck drivers, including drivers who work for trucking companies and independent truck owner-operators, operate heavy duty tractor-trailer trucks that transport enormous volumes of freight throughout the United States. Truck drivers–except drivers for some of the largest companies that operate their own fueling terminals–generally purchase diesel fuel, meals, and other supplies at truck stops while they are traveling.

27.     Truck stop companies operate truck stops throughout the United States. Truck stops are located primarily adjacent to the interstate highway system, including state turnpike systems. Truck stops supply fuel and other commodities and services to trucking companies and their truck drivers.

28.     Truck stop operators facilitate the transmission of data to trucking companies. Trucker Fleet Card companies collect and transmit data from the trucker (buying fuel and other products at the truck stop) to his or her trucking company. This data is transmitted, ordinarily, as part of a transaction in which the Trucker Fleet Card is used to pay the truck stop either with credit, or by billing the trucking company directly on behalf of the truck stop.

29.     The Trucker Fleet Card companies typically are called "third party billing" or "third party credit" companies because they do not themselves provide the goods or services to the truck operator at the point of sale.

30.     The data that the Trucker Fleet Card companies collect and transmit enable trucking companies to monitor and track such things as the location of their trucks, the timing and amount

7

of fuel and other purchases, and other information desired by trucking companies. Trucking companies rely on gathering such electronic data to control their costs, pay appropriate taxes, and plan effective use of their assets and employees. Trucker Fleet Cards also sometimes provide trucking companies and drivers with negotiated or discounted diesel fuel prices and other benefits.

31. Trucker Fleet Cards enable trucking companies to control purchases by truck drivers, allowing, for example, the purchase of diesel fuel and food and preventing the purchase of alcohol.

32. Traditional credit cards that merely provide credit for a fuel purchase–and do not also provide data capture and purchase controls to trucking companies–are not included in the Trucker Fuel Card market relevant to the antitrust claims asserted in this action. Because consumer credit card providers such as VISA, MasterCard, American Express, Diner's Club and Discover, do not provide specialized data capture and purchase control services, they are not part of the Trucker Fleet Card market relevant here. Also for this reason, payment for fuel by cash, checks or similar means are not part of the relevant Trucker Fleet Card market in this case.

33. The Federal Trade Commission (the "FTC") has concluded: "Because of the specialized features of [Trucker Fleet Cards], traditional credit cards and other types of fleet cards are not acceptable substitutes." FTC Analysis of Proposed Consent Order to Aid Public Comment, Sept. 9, 1999, *available at* http://www.ftc.gov/os/1999/09/ceridiananalysis.htm.

34. Truck stops cannot process Trucker Fleet Cards unless specifically designed electronic POS system computer devices are in place to facilitate the transaction as well as the data capture and purchase control functions.

35. Truck stop POS systems consist of hardware and software that can authorize and process Trucker Fleet Card transactions. Truck stops seek Trucker Fleet Card POS systems that

have the capacity to: authorize payment promptly; provide data capture and transaction processing to third parties, including legal fuel tax receipts; restrict purchases by drivers; and generate reports, including audit trail reports.

36.    A POS system must be able to accept leading Trucker Fleet Cards because the value of a POS system is tightly linked to its ability to process the methods of payment commonly used by trucking companies.

37.    POS systems serve as intermediaries. They provide financial information to truck stops so that the truck stops can collect payment from Trucker Fleet Card companies; relay transaction data from the truck driver to the Trucker Fleet Card company; and implement purchase controls requested by the trucking companies. A Trucker Fleet Card company receives the transaction data that is captured by the POS system so that it can relay that data back to the trucking company for whom the card was issued. A truck stop needs only to retain the data necessary for financial settlement with the Trucker Fleet Card company.

38.    Comdata both issues Trucker Fleet Cards to its trucking company customers and processes Trucker Fleet Card transactions through its Fleet Card POS systems that it leases to truck stops.

39.    Comdata has monopoly power in both the POS system and Trucker Fleet Card markets.

40.    Comdata has the power to maintain supracompetitive prices in both markets profitably without losing substantial sales.

41.    A significant, non-transitory price or fee increase by Comdata would not cause a significant loss of its sales to competitors in either the Fleet Card POS systems market or the Trucker

9

Fleet Card market.

42. Comdata offered its services in both markets at prices in excess of marginal costs and enjoys high profit margins.

43. Comdata has, and has exercised, the power to impair and exclude competition in both relevant markets.

44. The relevant markets in this case are:

**The Trucker Fleet Card Market.** The market in the United States for specialized Trucker Fleet Cards that provide to trucking companies operating long-haul, heavy duty trucks at least the following functions: credit or facilitation of direct billing by truck stops to the trucking companies for purchases made by truckers; convenient means of payment; transaction security; widespread acceptance at truck stops; specialized data collection services; and the ability of trucking companies to exercise control over trucker purchases; and,

**The Trucker Fleet Card POS Systems Market.** The market for providing to truck stops in the United States universal point-of-sale computer systems that are capable of the following: processing transactions using commercially available Trucker Fleet Cards; verifying authorization of Trucker Fleet Card transactions; collecting and transmitting data (*e.g.*, location, date, and gallons of fuel) while processing Trucker Fleet Card transactions; and imposing restrictions on purchases made with Trucker Fleet Cards.

45. Both markets are limited to the United States.

46. Beginning in approximately 1985, Trendar Corporation developed a popular Trucker Fleet Card POS system for truck stops (the "Trendar System"). Comdata acquired Trendar in 1995 and has, since that time, controlled as much as 90% of the Trucker Card POS systems market. *See Flying J, Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 825 (10th Cir. 2005) ("Comdata had secured approximately 90% of the point-of-sale systems market by 2001. Virtually every major U.S. truck stop other than Flying J used the Trendar System.").

47. Comdata is also the leading provider of Trucker Fleet Cards. Even one year after

entering into a consent decree designed to ameliorate Comdata's anticompetitive behavior (discussed below), Comdata still dominated the Trucker Fleet Card market with a 70% market-share. *See Flying J*, 405 F.3d at 825.

48.     Barriers to entry in each of these markets are high. This is so in the Trucker Fleet Card market because, *inter alia*, prospective market entrants must be widely accepted on the Trendar System owned by Comdata, given its prevalence, or convince truck stops to use a second or alternative POS system. There are significant barriers to entry in the Trucker Fleet Card POS systems market because prospective market entrants must be able to accept Comdata cards, given their prevalence, and therefore must seek and obtain authorization from Comdata to process Trucker Fleet Cards issued by Comdata.

49.     Comdata possesses the ability to preclude or delay new entry into the Trucker Fleet Card and the POS systems markets, to raise rivals' costs, to impair the opportunities and efficiencies of rivals, and to control prices and exclude competition in both relevant markets.

50.     Because of Comdata's dominance among truckers and trucking companies, truck stop owners would be at a significant competitive disadvantage in seeking trucking company business if their truck stops could not accept Comdata Trucker Fleet cards. Comdata, thus, has truck stops, especially Independent Truck Stops, at its mercy, and exercises its monopoly power over truck stops in numerous ways. For example, truck stops must obtain authorization from Comdata to accept Comdata cards. Comdata typically requires that any agreements authorizing truck stops to accept Comdata cards be terminable at will, without cause, and on either short notice or without any notice. Comdata can and does economically coerce truck stops to engage in, or refrain from, certain conduct, including conduct that impairs and disadvantages Trucker Fleet Card rivals, by threatening

11

to raise prices or withdraw from truck stop owners Comdata's authorization to process Comdata

Trucker Fleet Card transactions.

51.     Comdata also has the power to influence the volume of fuel sales at any truck stop

by failing to provide complete or accurate information concerning that truck stop.  For example,

Comdata can steer trucker business to one truck stop instead of another by informing trucking

companies of lower fuel prices at certain truck stops but failing to inform them that a competing

truck stop has also lowered its prices.

## PAST EFFORTS TO STOP DEFENDANTS' ANTICOMPETITIVE CONDUCT HAVE FAILED

52.     Comdata secured its dominant position in the market for Trucker Fleet Cards and the

market for the POS systems that process those cards through an aggressive acquisition strategy in

the mid- to late-1990s.  During that time period Comdata acquired, *inter alia*: (1) Trendar

Corporation (in 1995) to solidify its dominance in the Trucker Fleet Card POS systems market; and

(2) NTS (from First Data Corporation in 1998) to solidify its dominance in the Trucker Fleet Card

market.

53.     Following these acquisitions, both the FTC and one of Comdata's only competitors

in the POS and Trucker Fleet Card markets, Flying J, filed complaints against Comdata in the late-

1990s alleging violations of the antitrust laws.

54.     The FTC's complaint noted the high barriers to entry in both markets and explained,

"Prospective entrants  into the market for provision of [Trucker Fleet Cards] must be accepted onto

Ceridian's Trendar [POS] system and must establish a nationwide network of truck stop locations

that accept their cards.  Potential entrants into the [POS] market must be able to process Ceridian's

12

fleet cards in order to be viable options for truck stops." FTC Compliant, *In the Matter of Ceridian*

*Corp.*, No. 3933, April 5, 2000, *available at* http://www.ftc.gov/os/2000/04/ceridiancomplaint.htm.

55.     The FTC Analysis found that Comdata had used its monopoly power to preclude or

delay competition from rivals:

> Comdata . . . has the ability to preclude or delay new entry into the fleet card market,
> and to discipline or disadvantage new entrants or incumbent providers of fleet cards
> who seek to compete effectively with Comdata, by denying them access to Trendar's
> POS system or by granting access only on discriminatory terms. The investigation
> revealed evidence that Comdata has delayed or denied some fleet card competitors
> access to Trendar and Comdata has increased the fees to other firms for Trendar
> access.

FTC Analysis of Proposed Consent Order to Aid Public Comment, September 9, 1999, *available*

*at* http://www.ftc.gov/os/1999/09/ceridiananalysis.htm.

56.     Comdata's acquisitions violated antitrust laws, according to the FTC, "because they

gave Comdata the power to control entry into, and expansion by existing providers in, both the [POS

systems and Trucker Fleet Card markets]." FTC Press Release, "Final Approval Granted in FTC

Consent Agreement with Nation's Largest Trucking 'Fleet Card' Issuer," April 6, 2000, *available*

*at* http://www.ftc.gov/opa/2000/04/ceridiancorp.htm.

57.     Comdata entered into a consent decree with the FTC that became final in April 2000

and that required Comdata, *inter alia*, to process transactions involving rivals' Trucker Fleet Cards

on Comdata's Trendar System and to allow (through royalty-free licenses) three new Fleet Card

POS system-providers to process Comdata-issued Trucker Fleet Cards.

58.     Since that time, Comdata has issued three licenses to potential Fleet Card POS

system-provider competitors, but none of those competitors currently competes with Comdata in the

POS market.[1]

59.     The FTC's intervention has not deprived Comdata of its monopoly power in the

Trucker Fleet Card and Trucker Fleet Card POS systems markets, nor has it prevented Comdata

from abusing its monopoly power.

60.     Flying J issues a Trucker Fleet Card, the TCH Fuel Card,[2] that attempts to compete

with Comdata's Trucker Fuel Cards.   In 1996, Flying J filed a lawsuit challenging Comdata's

anticompetitive and exclusionary conduct under the antitrust laws.

61.     In 2001, Comdata settled with Flying J, agreeing to pay $49 million and to grant

prospective relief, including two licenses intended to facilitate the use of Flying J-issued Fleet Cards

on Comdata's monopoly Trendar POS system in truck stops.

62.     Flying J later brought a legal challenge to Comdata's implementation of the

settlement agreement, arguing that Comdata had failed to abide by the agreement, and that in so

doing, Comdata had hampered Flying J's ability to compete with Comdata in the Trucker Fleet Card

market.

63.     The trial court agreed with Flying J that Comdata had breached the settlement

agreement.

64.     On appeal, the Tenth Circuit recognized the underlying anticompetitive conduct in

---

[1] Two potential competitors apparently ceased competing in the POS systems market, and Comdata entered into a joint marketing agreement with the third would-be competitor, whose product is now included in Comdata's OmniDesq POS system.

[2] TCH LLC, which issues the TCH-branded Trucker Fleet Cards, is 75 percent owned by Flying J. For simplicity, this Complaint will refer to TCH Trucker Fleet Cards as being issued by Flying J.

which Comdata had engaged:

> When Flying J entered the [Trucker Fleet Card] market in the mid-1990s, it faced two significant barriers to entry. First, the Trendar System did not accept the [(Flying J-issued)] TCH Fuel Card. Merchants using Trendar could not process TCH Fuel Card transactions; therefore, Flying J customers could not use the TCH Fuel Card at Trendar locations. Given the ubiquity of the Trendar System, this was a big problem for Flying J. Second, *the record shows that Comdata engaged in a campaign to pressure truck stops not to accept the TCH Fuel Card . . . . Comdata placed over four hundred telephone calls to truck stops and threatened to raise transaction fees on Comdata cards if they agreed to accept the TCH Fuel Card.*

*Flying J*, 405 F.3d at 827 (emphasis added).

65.     Nevertheless, the Tenth Circuit reversed the trial court, concluding that the settlement

agreement did not require Comdata to open up the market for Trucker Fleet Cards in the way that

Flying J had argued.  As the dissent explained:

> This case is a dispute over a claim that Comdata violated antitrust laws by restricting Flying J's access to the market.  On the eve of trial, because Comdata realized it was in jeopardy of an adverse judgment, it agreed to pay forty-nine million dollars to Flying J to compensate for past violations.  In addition, to rectify future restrictions on market entry, it entered into the license that is the subject of the dispute on appeal. . . . What we do know is that the overall purpose of the license was to open access to the market. . . . The district court's selection of the interpretation that favors optimal opening of the competitive market seems to me to be eminently reasonable.

*Flying J*, 405 F.3d at 838 (McKay, J., dissenting).

66.     The settlement between Flying J and Comdata, like the FTC consent decree, has not

protected Independent Truck Stops from anticompetitive conduct in the Fleet Card and Fleet Card

POS markets.

### DEFENDANTS' ONGOING ANTICOMPETITIVE CONDUCT

A.     **Monopoly Leveraging**

67.     Comdata leverages its monopoly power in the Trucker Fleet Card POS systems

15

market to exclude and impair rival issuers from the Trucker Fleet Card market.

68.     By the late 1990s, following its acquisition of the Trendar POS system, Comdata dominated that POS systems market for processing Trucker Fleet Cards.

69.     When Flying J sought to enter the Trucker Fleet Card market with its TCH-brand Trucker Fleet Card, Comdata's Trendar POS system was programmed not to process transactions for customers using the TCH card.

70.     Trucking companies and their truck drivers had limited use for a new Trucker Fleet Card that would not be widely and easily accepted at the nation's truck stops. Because of Comdata's exclusionary conduct, trucking companies had little incentive even to try the TCH card regardless of lower pricing or other features and benefits that Flying J might offer. "Merchants using Trendar could not process TCH Fuel Card transactions; therefore, Flying J customers could not use the TCH Fuel Card at Trendar locations. Given the ubiquity of the Trendar System, this was a big problem for Flying J." *Flying J*, 405 F.3d at 827 (emphasis added).

71.     Comdata's decision not to process TCH transactions on the Trendar POS system erected an unreasonably high barrier to entry for Flying J. Comdata controlled the key to entry to the market–access to transaction processing on the Trendar POS system–and effectively locked Flying J and its TCH card out of the Trucker Fuel Card market by leveraging its monopoly power in the Fleet Card POS systems market.

72.     Flying J filed suit against Comdata for unlawfully leveraging its monopoly power to impair Flying J's ability to compete in the Trucker Fleet Card market.

73.     Comdata paid $49 million and agreed to prospective relief, including permitting Flying J and other potential competitors access to its POS system, to settle the lawsuit filed by

Flying J and a companion suit filed by the FTC.

74.     As a condition of settlement of the Flying J litigation, Comdata programmed its Trendar System to accept one Flying J-issued Trucker Fleet Card. However, Comdata programed its system simply to provide payment processing, and not the data capture and purchase control services that are so valuable to trucking companies. *Flying J*, 405 F.3d at 827.

75.     Comdata's decision to deny data capture and purchase controls when processing the Flying J-issued card on Comdata's POS systems blocked Flying J from being able to compete effectively in the Trucker Fleet Card market. As the Tenth Circuit noted about the exclusionary conduct that is an ongoing part of Comdata's scheme to monopolize: "[The lack of data capture and purchase controls] on TCH Mastercard processing hinders Flying J's ability to compete in the [Trucker Fleet Card] market." *Flying J*, 405 F.3d at 828.

76.     Comdata continues to leverage its dominance in the market for Fleet Card POS systems to impair competition in the market for Trucker Fleet Cards. Comdata refuses to program its Fleet Card POS systems to allow rival Trucker Fleet Cards to function adequately. This conduct impairs the ability of its rivals to compete and enables Comdata to maintain and enhance its monopoly power in the Trucker Fleet Card market.

**B.      Exclusionary Contractual Terms**

**i.      Bans on Surcharging, Rebates, and Steering to Rival Cards**

77.     Truck stops, including the Chains, must accept Comdata-issued Trucker Fleet Cards or risk losing the substantial percentage of their customers and potential customers that use Comdata Trucker Fleet Cards.

78.     Comdata uses its market power to impose contractual provisions on truck stops that

17

have the aim and effect of impairing the ability of Trucker Fleet Card rivals to compete for customers and market share. These truck stop contracts include provisions prohibiting truck stops from charging their customers surcharges when customers use Comdata-issued cards, even if Comdata's cards are more expensive to the truck stops. The contracts also include provisions prohibiting truck stops from steering customers to rival cards such as by granting rebates to their customers when customers use cards issued by Comdata's rivals, even if the rival cards are less expensive to the truck stops. Additionally, the rules prevent truck stops from steering customers to alternative forms of payment (such as cash). Through these contractual provisions, therefore, Comdata prevents trucks stops from passing along the cost savings associated with use of rival cards or payment systems to their trucker customers.

79. Comdata's agreements with truck stops also bar truck stops from attempting to convert Comdata customers to any other Trucker Fleet Card program or card.

80. Many competing Trucker Fleet Cards–like Flying J's TCH cards–offer lower transaction fees to the truck stops. By forcing truck stops to charge the same price to every truck driver regardless of the method of payment, Comdata's contractual provisions eliminate incentives to trucking companies to switch to cheaper payment methods (such as Fleet Cards issued by Comdata's rivals).

81. As a result of Comdata's exclusionary contracts, the market for Trucker Fleet Card services is distorted in that per transaction prices to consumers do not reflect the actual cost of the transaction. In this way, Comdata has been able to insulate itself from price competition from rival Fleet Cards. Comdata has thereby prevented its rivals from breaking into the market, and expanding acceptance of their Fleet Cards despite the rivals' often lower prices and/or fees.

18

82.     In the absence of the provisions banning surcharges, rebates, and steering to rivals, truck stops would be able to encourage customers to use the Trucker Fleet Cards of Comdata's rivals.

83.     These exclusionary provisions serve to maintain and enhance Comdata's monopoly power, and result – by themselves, and in conjunction with the other aspects of the monopolization scheme alleged herein – in Comdata's imposition of artificially inflated prices on Plaintiff and the Class.

### ii.     Anticompetitive "Most Favored Nation" Provisions

84.     Comdata's contracts with truck stops contain certain anticompetitive "most favored nation" (or "MFN") provisions that prevent truck stops from paying a higher processing fee to any of Comdata's competitors than they pay to Comdata.

85.     Truck stops may desire that customers use rival cards–even if they have higher fees associated with processing those rival cards–because of anticipated increased ancillary sales or for other business reasons.  However, the MFN provision in Comdata's contracts greatly increases the cost of accepting such competitors' cards because the truck stops would need to pay Comdata the same (higher) rate on each Comdata-processed transaction.

86.     The MFN provision in Comdata contracts ensures that even Trucker Fleet Card issuers servicing trucking fleets with desirable clientele cannot compete effectively with Comdata.

87.     The MFN provision is, in essence, a threat of higher fees for truck stops that accept competitors' higher-priced cards.

88.     These provisions further impair the ability of rival Trucker Fleet Cards from breaking into the Trucker Fleet Card market and from effectively competing with Comdata, and thus they

19

serve, by themselves and in conjunction with other aspects of the monopolization scheme, to maintain and enhance Comdata's monopoly power.

      **C.**      **Comdata Conscripted Chain Truck Stops Into Its Exclusionary Scheme**

      89.      Comdata has further exercised its monopoly power, and excluded and impaired the opportunities of its Fleet Card rivals, by conscripting Truck Stop Chains into Comdata's scheme to monopolize.

      90.      Comdata recognized that keeping rival Fleet Cards from gaining acceptance at the Chains would deprive those rivals of market share and prevent them from marketing themselves to trucking companies as having widespread acceptance among truck stops. Comdata devised and implemented an anticompetitive scheme under which Comdata: (a) threatened the Chains with punitive transaction fees if the Chains accepted rival Trucker Fleet Cards; and (b) imposed a two-tier pricing system under which the Chains would pay transaction fees that were less inflated than the fees paid by Independent Truck Stops in exchange for the Chains' agreements not to accept rival Trucker Fleet Cards.

      91.      Historically, truck stops paid Fleet Card providers a flat per-transaction fee of approximately $0.40 to $1.00 each time they submitted a transaction for processing. Comdata has preserved the flat-fee structure for certain Chain Truck Stops as remuneration for agreement by these Chains to assist in Comdata's scheme to impair the ability of its Fleet Card rivals to gain market share and, thereby, potentially become effective competitors in the Fleet Card market.

      92.      Beginning in approximately July 2001, after the FTC consent decree and the Flying J settlement were executed, Comdata began to implement its two-tier pricing scheme under which the Chains that had agreed to assist in Comdata's scheme to monopolize were still charged the flat

rate transaction fees, and Independent Truck Stops were charged a percentage (usually 1% to 3%) of each transaction. Given that filling up an average truck fuel-tank (which can exceed 100 gallons) costs multiple hundreds of dollars, Independent Truck Stops have been forced to pay transaction fees that can be 500 to 800 percent higher than they previously paid, and than the compliant Chain Truck Stops continue to pay.

93.     Moreover, certain Chain Truck Stops agreed not to accept competitors' Fleet Cards (like the TCH card), and were rewarded with Comdata's imposition of its two-tier pricing structure, substantially benefitting the Chains at the expense of the Chains' Independent rivals.

94.     Comdata has attempted to impair, and has succeeded in impairing, the entry, growth and success of competitors, like TCH, by leveraging Comdata's monopoly power in the relevant markets and engaging in a scheme involving both punishments (sticks) and rewards (carrots). The punishment involved Comdata threatening Chain Truck Stops that if they accepted rival cards, Comdata would impose punitive transaction fees. The rewards Comdata offered to certain Chain Truck Stops were as follows: if a Chain Truck Stop agreed not to accept rival Trucker Fleet Cards, the chain would (a) continue to be charged the flat-rate transaction fees, and (b) the Independent Truck Stops would be placed at a competitive disadvantage to the Chains and would be unable to compete effectively because of the punitive percentage-based transaction fees Comdata would impose on them.

95.     As a result of Comdata's unlawful anticompetitive actions, Independent Truck Stops pay significantly higher fees for Trucker Fleet Card processing. Consequently, Independent Truck Stops have higher costs, and are less robust rivals to the Chains than they otherwise would be. As the Independents become less competitive, the Chains are able to raise their prices given the

21

decreased competition from the Independents, hurting consumers.

96.     Comdata's two-tier pricing structure rewards the Chains for their agreement not to accept rival Trucker Fleet Cards, artificially inflating transaction processing fees paid by the Independent Truck Stops.

97.     Comdata's activities are anticompetitive and an unreasonable restraint of trade. This anticompetitive behavior also serves to reinforce and extend Comdata's monopoly power in the relevant markets.

## ANTITRUST INJURY TO PLAINTIFF AND MEMBERS OF THE CLASS

98.     During the Class Period, Plaintiff and members of the Class purchased Fleet Card POS processing services from Defendants. As a result of Defendants' illegal scheme to monopolize, including exclusionary agreements in unreasonable restraint of trade, members of the Class were compelled to pay, and did pay, artificially inflated prices and/or fees for truck stop payment processing, including artificially inflated, punitive transaction fees.

99.     If competitors had not been unlawfully discouraged from entering the Trucker Fleet Card market and competing with Defendants, Independent Truck Stops, such as Plaintiff and the members of the Class, would have paid substantially less for Trucker Fleet Card processing.

100.    As a consequence, competition in the market for Trucker Fleet Cards was substantially harmed, and Plaintiff and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount of such damages will be calculated after discovery and upon proof at trial.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2: Scheme to Monopolize

101.    Plaintiff incorporates by reference the preceding allegations.

102.    As set forth above, in violation of § 2 of the Sherman Act, Defendants acquired, maintained, and/or enhanced their monopoly power in the Trucker Fleet Card and Trucker Fleet Card POS systems markets by engaging in an exclusionary scheme to monopolize that raised the costs of Defendants' rivals and impaired the rivals' opportunities to compete.

103.    Comdata intentionally sought to obtain, maintain, and enhance its monopoly power in the Trucker Fleet Card market.

104.    Defendants Comdata imposed anticompetitive terms in its contracts with truck stops, such as bans on rebates, on surcharges and on steering customers to rivals as well as MFN provisions.  These terms had the aim and effect of impairing the opportunities of Comdata's rivals and thereby maintaining and extending Comdata's monopoly power in the Trucker Fleet Card market.

105.    Comdata further leveraged its monopoly power in the Fleet Card POS systems market by refusing to process, and imposing restrictions on processing, rivals' Trucker Fleet Cards, thereby maintaining and enhancing its monopoly power in the Trucker Fleet Card market.

106.    As part of its monopolization scheme, Comdata also conspired with certain Chain Truck Stops, whereby the Chains agreed not to accept Fleet Cards from Comdata's rivals, thereby impairing Comdata's rivals and maintaining and enhancing Comdata's monopoly power.  These actions had the goal and effect of hampering rivals' entry into, and expansion in, the Trucker Fleet

23

Card market, and of maintaining and enhancing Comdata's monopoly power in the Trucker Fleet Card market.

107.    Plaintiff and members of the Class have been injured in their business or property by Defendants' monopolization scheme. Their injuries result from paying artificially inflated prices and/or fees for truck stop payment processing, including artificially high per-transaction fees on Comdata-issued Trucker Fleet Cards. Such injuries, in the form of overcharges, are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

**COUNT II**
**Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1:**
**Unlawful Agreements in Unreasonable Restraint of Trade**

108.    Plaintiff incorporates by reference the preceding allegations.

109.    As set forth above, on information and belief, in violation of § 1 of the Sherman Act, Defendants Comdata and Ceridian entered into exclusionary agreements in unreasonable restraint of trade with certain Chain Truck Stops, under which Chain Truck Stops agreed not to accept the Trucker Fleet Cards of Comdata's competitors in exchange for Comdata's agreement to charge the Chains lower transaction fees than it charges the Independent Truck Stops.

110.    These agreements were an unreasonable restraint of trade and affected trade in interstate commerce.

111.    Plaintiff and members of the Class have been injured in their business or property by Defendants' antitrust violations. The injury to Plaintiff and the Class consists of paying artificially inflated transaction fees for truck stop payment processing, including artificially high per-transaction fees charged on Comdata-issued Trucker Fleet Cards. Such injury, in the form of overcharges, is

of the type the antitrust laws were designed to prevent, and flows from that which makes Defendants' conduct unlawful.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following:

A.     Judgment in favor of itself and the Class it seeks to represent and against Defendants, and each of them, for damages, measured as the overcharges Plaintiff and the other members of the Class paid to Defendants as a result of Defendants' anticompetitive conduct, trebled;

B.     Pre- and post-judgment interest;

C.     Injunctive relief to prevent further anticompetitive conduct; and

D.     Costs of suit, including reasonable attorneys' fees.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: March 19, 2007

Eric L. Cramer
David F. Sorensen
John D. Radice
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

25

Robert N. Kaplan
Linda P. Nussbaum
**KAPLAN FOX & KILSHEIMER, LLP**
805 Third Avenue
New York, NY 10022
Tel: 212.687.1980
Fax: 212.687.7714

Barry S. Taus
**GARWIN GERSTEIN & FISHER, LLP**
1501 Broadway
New York, NY 10036
Tel: (212) 398-0055
Fax: (212) 764-6620

Eugene A. Spector
**SPECTOR, ROSEMAN & KODROFF, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611

Kendall Zylstra
Jerome Marcus
**MARCUS AUERBACH & ZYLSTRA LLC**
P.O. Box 8876
Elkins Park, PA 19027
Tel: (215) 782.3300
Fax: (888) 875.0469

Norman P. Zarwin
Devon F. Snell
**ZARWIN, BAUM, DEVITO, KAPLAN, SCHAER & TODDY, P.C.**
1515 Market Street, Suite 1200
Philadelphia, PA 19102
Tel: (215) 569-2800
Fax: (215) 569-1606

*Counsel for Plaintiff Universal Delaware, Inc. d/b/a the Gap Truck Stop*