# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **MARCHBANKS TRUCK SERVICE, INC.,** *et al.*, on behalf of themselves and all others similarly situated,<br><br>                         **Plaintiffs,**<br><br>        **v.**<br><br>**COMDATA NETWORK, INC.,** *et al.*,<br><br>                         **Defendants.** | **Civil Action No. 07-1078-JKG**<br><br>**Consolidated Case** |

## MEMORANDUM OF FACTS AND LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................. 1

II.   BACKGROUND .............................................................................. 3

      A.    Plaintiffs Asserted Antitrust Claims Against Defendants Regarding
            Comdata's Over-the-Road Fleet Cards ................................................ 3

      B.    Prior to Settlement, the Parties Conducted Extensive Discovery
            and Engaged in Substantial Motion Practice .............................................. 4

      C.    The Parties' Protracted Negotiations Resulted in a Settlement
            Valued Between $390 to $621 Million. .................................................... 5

      D.    The Court Certified the Settlement Class, Preliminarily Approved
            the Settlement, and Directed That Notice Be Issued to the
            Settlement Class. ....................................................................... 9

      E.    Notice was Disseminated Through First-Class Mail, Publication in
            National Periodicals, and a Website. ..................................................... 9

III.  ARGUMENT .................................................................................. 11

      A.    The Court Should Finally Approve the Settlement, Which Is Fair,
            Reasonable, Adequate, and in the Best Interest of the Settlement
            Class ................................................................................... 11

            1.    The *Girsh* Factors Weigh Heavily and Uniformly in Favor
                  of Final Approval. ............................................................... 13

                  a.    The Complexity, Expense, and Likely Duration of
                        the Litigation ............................................................ 13

                  b.    The Reaction of the Class to the Settlement ................... 16

                  c.    The Stage of the Proceedings and the Amount of
                        Discovery Completed ...................................................... 17

                  d.    The Risks of Establishing Liability and Damages ........... 18

                  e.    The Risks of Maintaining the Class Action through
                        Trial ..................................................................... 19

                  f.    The Ability of Defendants to Withstand a Greater
                        Judgment ................................................................. 20

                  g.    The Range of Reasonableness of the Settlement
                        Fund in Light of the Best Possible Recovery and All
                        the Attendant Risks of Litigation .................................... 21

# TABLE OF CONTENTS
### (continued)

**Page**

    2.    The Relevant *Prudential* Factors Likewise Favor Final Approval .................................................................................. 22

        a.    Factors That Bear on the Maturity of the Underlying Substantive Issues ............................................................. 22

        b.    Whether Class or Subclass Members Are Accorded the Right to Opt Out of the Settlement ............................ 23

        c.    Whether Any Provisions for Attorneys' Fees Are Reasonable ..................................................................... 23

        d.    Whether the Procedure for Processing Individual Claims under the Settlement is Fair and Reasonable ....... 23

B.    Plaintiffs' Proposed Plan of Allocation and Distribution is Fair, Reasonable, and Adequate ................................................................. 24

C.    Adequate Notice Was Provided to the Class Consistent With the Court's Order Preliminarily Approving the Settlement .......................... 28

D.    The Notice Requirements Of The Class Action Fairness Act Have Been Satisfied ......................................................................... 30

IV.    CONCLUSION ................................................................................. 30

1180563.1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bell Atl. Corp. v. Bolger,*
  2 F.3d 1304 (3d Cir. 1993) ................................................... 17

*Boone v. City of Phila.,*
  668 F. Supp. 2d 693 (E.D. Pa. 2009) .................................... 17

*Careccio v. BMW of N. Am. LLC,*
  No. 08-2619, 2010 U.S. Dist. LEXIS 42063 (D.N.J. Apr. 29, 2010) ...................................... 29

*Chakejian v. Equifax Info. Servs.,*
  275 F.R.D. 201 (E.D. Pa. 2011) ..................................... 22, 29

*Comer v. Life Ins. Co.,*
  No. 08-cv-228-JFA, 2011 U.S. Dist. LEXIS 36042 (D.S.C. Mar. 31, 2011) ......................... 29

*Cullen v. Whitman Med Corp.,*
  197 F.R.D. 136 (E.D. Pa. 2000) ................................... 17, 22

*Ehrheart v. Verizon Wireless,*
  609 F.3d 590 (3d Cir. 2009) ................................................ 11

*Fisher Bros. v. Phelps Dodge Indus., Inc.,*
  604 F. Supp. 446 (E.D. Pa. 1985) ................................. 13, 22

*Girsh v. Jepson,*
  521 F.2d 153 (3d Cir. 1975) ................................................ 12

*Hall v. Best Buy Co., Inc.,*
  274 F.R.D. 154 (E.D. Pa. 2011) .......................................... 12

*Hanrahan v. Britt,*
  174 F.R.D. 356 (E.D. Pa. 1997) .......................................... 12

*In re Auto. Refinishing Paint Antitrust Litig.,*
  617 F. Supp. 2d 336 (E.D. Pa. 2007) .................................. 14

*In re Cendant Corp. Litig.,*
  264 F.3d 201 (3d Cir. 2001) ......................................... 13, 18

*In re Elec. Carbon Prods. Antitrust Litig.,*
  447 F. Supp. 2d 389 (D.N.J. 2006) ..................................... 19

-iii-

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Fasteners Antitrust Litig.,*
   No. 08-md-1912, 2014 U.S. Dist. LEXIS 8829 (E.D. Pa. Jan. 24, 2014) ................... 14, 17, 23

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
   55 F.3d 768 (3d Cir. 1995) ................................................................. 18

*In re Ikon Office Solutions, Inc.,*
   194 F.R.D. 166 (E.D. Pa. 2000) .......................................................... 24

*In re Ikon Office Solutions, Inc., Sec. Litig.,*
   194 F.R.D. 166 (E.D. Pa. 2000) ...................................................... 13, 15

*In re Ins. Brokerage Antitrust Litig.,*
   297 F.R.D. 136 (D.N.J. 2013) ............................................................ 16

*In re Linerboard Antitrust Litig.,*
   292 F. Supp. 2d 631 (E.D. Pa. 2003) ................................................... 12

*In re Linerboard Antitrust Litig.,*
   296 F. Supp. 2d 568 (E.D. Pa. 2003) ................................................... 14

*In re Pet Food Prods. Lib. Litig.,*
   629 F.3d 333 (3d Cir. 2010) ....................................................... 11, 12, 13, 18

*In re Processed Egg Prods. Antitrust Litig.,*
   284 F.R.D. 249 (E.D. Pa. 2012) ...................................................... 15, 20

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,*
   148 F.3d 283 (3d Cir. 1998) ......................................................... passim

*In re Remeron End-Payor Antitrust Litig.,*
   No. 02-2007 (FSH), 2005 U.S. Dist. LEXIS 27011 (D.N.J. Sept. 13, 2005) .......................... 19

*In re Rite Aid Corp. Sec. Litig.,*
   396 F.3d 294 (3d Cir. 2005) ......................................................... 2, 17

*In re Warfarin Sodium Antitrust Litig.,*
   391 F.3d 516 (3d Cir. 2004) ...................................................... 16, 17, 21

*Lachance v. Harrington,*
   965 F. Supp. 630 (E.D. Pa. 1997) ....................................................... 18

*Lazy Oil Co. v. Witco Corp.,*
   95 F. Supp. 2d 290 (W.D. Pa. 1997) .................................................. 19, 21

1180563.1

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Marchbanks Truck Serv. v. Comdata Network, Inc.*,
    No. 07-cv-1078, 2011 U.S. Dist. LEXIS 158011, 2011 WL 11559549  (E.D. Pa. Mar. 24,
    2011) ........................................................................................................................................ 4

*Marchbanks Truck Serv. v. Comdata Network, Inc.*,
    No. 07-cv-1078, 2012 U.S. Dist. LEXIS 189789, 2012 WL 10218913 (E.D. Pa. Mar. 29,
    2012) ........................................................................................................................................ 4

*Mehling v. N.Y. Life Ins. Co.*,
    248 F.R.D. 455 (E.D. Pa. 2008) ............................................................................................ 24

*Nichols v. SmithKline Beecham Corp.*,
    No. 00-6222, 2005 U.S. Dist. LEXIS 7061 (E.D. Pa. Apr. 22, 2005) .................................... 29

*Perry v. FleetBoston Fin. Corp.*,
    229 F.R.D. 105 (E.D. Pa. 2004) ...................................................................................... 18, 21

*Reibstein v. Rite Aid Corp.*,
    761 F. Supp. 2d 241 (E.D. Pa. 2011) .................................................................................... 20

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011) .................................................................................... 11, 12, 13

*Sutton v. Medical Serv. Ass'n*,
    No. 92-4787, 1994 U.S. Dist. LEXIS 7512 (E.D. Pa. June 8, 1994) ...................................... 19

**STATUTES**

28 U.S.C. § 1715 ............................................................................................................................ 30

28 U.S.C. § 1715(d) ...................................................................................................................... 30

**RULES**

Fed. R. Civ. P. 23(e) ...................................................................................................................... 29

-v-

## I.   **INTRODUCTION**[1]

In this antitrust class action that has spanned seven years, the Court certified the Settlement Class[2] and preliminarily approved the parties' Class Action Settlement ("Settlement") and proposed Plan of Administration and Distribution.  *See* Mar. 17, 2014 Order ("Preliminary Approval Order") ¶¶ 3-4, 6, 11[Dkt. 705].  Pursuant to the Court's Order, Plaintiffs Marchbanks Truck Service, Inc., d/b/a Bear Mountain Travel Stop; Gerald F. Krachey d/b/a Krachey's BP South; Walt Whitman Truck Stop, Inc.; and Mahwah Fuel Stop (collectively, "Plaintiffs" or "Class Representatives") notified the Settlement Class about the Settlement, which provides substantial relief, including: (a) $130 million in cash; (b) prospective relief—in the form of, among other things, meaningful and enforceable commitments by Comdata to modify or not to enforce those portions of Comdata's merchant services agreements that Plaintiffs challenged as anticompetitive, and that an expert economist has determined to be worth an additional $260 million to $491 million (bringing the total value of the Settlement to between $390 and $621

---

[1] Certain capitalized terms used in this brief are defined in Section I of the Settlement Agreement.

[2] The Settlement Class is defined as:

> All owners and operators of truck stops or other retail fueling facilities with at least one physical location in the United States that paid Merchant Transaction Fees directly to Comdata on Comdata Proprietary Transactions and that were calculated based on a percentage of the face amount of the transaction during the Settlement Class Period with the exception of Mobile Fuelers, Wilco-Hess locations, the Pilot Defendants, the TA Defendants, and Love's and any of the parents, subsidiaries, affiliates, franchisees or employees of any of the Defendants.

*See* Settlement Agreement ¶ 2 [Dkt. 700]; *see also* Preliminary Approval Order ¶ 6 (certifying Settlement Class).  The Court provided that certification was "for settlement purposes only and conditioned upon the entry of [the Preliminary Approval Order], and the Final Order and Final Judgment, and the occurrence of the Final Effective Date."  Preliminary Approval Order ¶ 6.

1180563.1

million); and (c) an agreement by Comdata to engage in good faith negotiations relating to, among other things, merchant transaction fees with certain Buying Groups of Independent Truck Stops that are, collectively, composed of hundreds of members of the Settlement Class.  *See* Decl. of Eric Cramer in Support of Pls.' Motion for Final Approval of Settlement ("Cramer Decl.") ¶¶ 7-10, 27 [Dkt. 707-2].

Each of the Class Representatives supports the Settlement without reservation.[3]  The absent Settlement Class Members—most of whom are sophisticated operators of small and medium sized businesses—likewise have responded in an overwhelmingly positive fashion, confirming that that the Settlement should be finally approved.  There were ***no*** objections *or* opt-out requests, demonstrating the resounding approval of the thousands of independent Truck Stops and other Retail Fueling Facilities in the Settlement Class.  The absence of any objections or opt-outs from a class "is a rare phenomenon," particularly where, as here, there are sophisticated class members.  *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005).  Moreover, the Claims filed amount to approximately 62% of the total overcharges incurred by the Settlement Class.  This substantial participation in the Claims process further shows Settlement Class Members' support of the Settlement.  In addition to these indicators of approval, the leaders of four independent Truck Stop Buying Groups—which collectively represent over 675 Independent Truck Stops—have affirmatively expressed their strong support for the Settlement.[4]

---

[3] Decl. of Wm. Patrick Marchbanks in Support of Final Approval ("Marchbanks Decl.") ¶ 12 [Dkt. 707-4]; Decl. of David Silverman in Support of Final Approval ("Silverman Decl.") ¶ 8 [Dkt. 707-5]; Decl. of Alynne Rosenfarb in Support of Final Approval ("Rosenfarb Decl.") ¶ 10 [Dkt. 707-4]; Decl. of Douglas Krachey in Support of Final Approval ("Krachey Decl.") ¶ 8 [Dkt. 707-4].

[4] *See* Decl. of Kelly Rhinehart ("Rhinehart Decl.") ¶ 4; Decl. of Burt Newman, Sr. ("Newman Decl.") ¶ 4; Decl. of Steve Allen ("Allen Decl.") ¶ 4; Decl. of Marsha Bird ("Bird Decl.") ¶ 4

The Court has preliminarily found the Settlement to be fair, reasonable, and adequate, Preliminary Approval Order ¶ 3, and Settlement Class Members' strong positive reaction shows that they agree. For these reasons and those stated below, the Court should grant final approval of the Settlement and Plan of Administration and Distribution, and bring this hard-fought, seven-year lawsuit to a close.

## II.   BACKGROUND

### A.   Plaintiffs Asserted Antitrust Claims Against Defendants Regarding Comdata's Over-the-Road Fleet Cards

This case is an antitrust action against Defendants[5] brought on behalf of a proposed class of independent Truck Stops and other Retail Fueling Facilities that accept Comdata's specialized payment cards (known as "Fleet Cards" or "OTR Fleet Cards") used by over-the-road ("OTR"), long-haul fleets ("Fleets") to purchase diesel fuel and other items. Comdata has been the leading OTR Fleet Card issuer for the period relevant to this case. Plaintiffs allege that the challenged conduct allowed Comdata and Ceridian (Comdata's parent) to restructure, and thereby artificially inflate, Comdata's Merchant Transaction Fees to members of the Settlement Class beginning in or about 2000-2001 (the "Fee Restructuring"). Plaintiffs alleged that, as a result of the claimed anticompetitive conduct, Settlement Class Members paid supracompetitive transaction fees to Comdata when processing Comdata Proprietary Transactions.

---

[Dkt. 707-4].

[5] Defendants in this action are Comdata Network, Inc. d/b/a Comdata Corporation ("Comdata") n/k/a Comdata Inc., its parent Ceridian Corporation n/k/a Ceridian LLC ("Ceridian"), and certain major chain truck stops, namely: (1) Pilot Travel Centers LLC and Pilot Corporation (collectively "Pilot Defendants"); (2) TravelCenters of America LLC and its wholly owned subsidiaries TA Operating LLC f/k/a TA Operating Corporation d/b/a TravelCenters of America, TravelCenters of America Holding Company LLC f/k/a TravelCenters of America, Inc., and Petro Stopping Centers, L.P. (collectively, "TA Defendants"); and (3) Love's Travel Stops & Country Stores, Inc. ("Love's") (collectively the "Major Chains").

The challenged conduct here (the "Scheme") had two main alleged facets.  First, after acquiring several OTR Fleet Card competitors to obtain market dominance, Comdata (with Ceridian's involvement) entered into what Plaintiffs alleged were illegal agreements that restricted the Major Chains—Comdata's customers *and* competitors—from competing with Comdata or supporting rival OTR Fleet Cards.  Plaintiffs alleged that these Major Chain agreements reflected an overarching agreement between Comdata and the Major Chains, in which Comdata agreed to offer the Major Chains low, flat Merchant Transaction Fees while impairing the Major Chains' competitors—the Independents—with much higher fees.  Second, Comdata imposed what Plaintiffs alleged were anticompetitive anti-steering restrictions on the Settlement Class Members.  Plaintiffs alleged that the agreements and restrictions that constituted the Scheme blocked competitive forces and enabled Comdata to impose artificially inflated fees on the Settlement Class.

     **B.**      **Prior to Settlement, the Parties Conducted Extensive Discovery and Engaged in Substantial Motion Practice**

Each of the Defendants, having consistently denied Plaintiffs' allegations and raised multiple defenses to the merits of the claims, moved to dismiss Plaintiffs' Second Consolidated Amended Complaint, and most moved (again) to dismiss Plaintiffs' Third Consolidated Complaint.  Cramer Decl. ¶ 18.  The Court mainly denied the first round of motions and entirely denied the second round.[6]

---

[6] *Marchbanks Truck Serv. v. Comdata Network, Inc.*, No. 07-cv-1078, 2012 U.S. Dist. LEXIS 189789, 2012 WL 10218913 (E.D. Pa. Mar. 29, 2012); *Marchbanks Truck Serv. v. Comdata Network, Inc.*, No. 07-cv-1078, 2011 U.S. Dist. LEXIS 158011, 2011 WL 11559549  (E.D. Pa. Mar. 24, 2011).

Before, during, and after Defendants had moved to dismiss, Co-Lead Class Counsel[7]

pursued extensive discovery from all five sets of Defendants and from third parties beginning the

moment discovery opened in October 2007 until discovery closed on May 24, 2013. *See* Cramer

Decl. ¶ 19.  During the course of the extended discovery period, the parties took over 70

depositions of parties, non-parties, and expert witnesses, and reviewed millions of pages of

documents produced by Plaintiffs, Defendants, and third parties. *Id.* ¶ 20.  Further, Plaintiffs

retained three economic experts, while Defendants retained four experts, all of whom issued

reports and were deposed. *Id.*  Plaintiffs and Defendants filed and argued motions to exclude or

strike all or portions of the opposing experts' opinions. *Id.* ¶¶ 21, 23.  The parties settled shortly

before the Court's scheduled hearing on Plaintiffs' Class Certification Motion, which entailed

extensive briefing detailing Plaintiffs' theories of the case and Defendants' defenses. *Id.* ¶¶ 22,

24.  At the time of settlement, Ceridian had moved for summary judgment (which was fully

briefed) and the deadline for the remaining summary judgment motions, March 3, 2014, was fast

approaching. *Id.* ¶ 24.   Trial was scheduled for August 2014.

>    **C.      The Parties' Protracted Negotiations Resulted in a Settlement Valued
>            Between $390 to $621 Million.**

The protracted settlement negotiations between Plaintiffs and Defendants were hard

fought, conducted at arm's length, and guided by two separate, experienced, independent

mediators, and by the Court.

The case resolved only after several failed efforts at settlement over several years,

including a Court-ordered in-person settlement conference with Magistrate Judge Perkin in 2011,

---

[7] Co-Lead Class Counsel refers to Eric L. Cramer and Andrew C. Curley of Berger & Montague, P.C., Eric B. Fastiff and Dean M. Harvey of Lieff Cabraser Heimann & Bernstein, LLP, and Stephen R. Neuwirth and Dale H. Oliver of Quinn Emanuel Urquhart & Sullivan, LLP, all of whom the Court appointed Plaintiffs' Class Counsel in its Preliminary Approval Order. *See* Preliminary Approval Order ¶ 7.

and a July 2012 mediation between Plaintiffs and Defendants Comdata and Ceridian with a private mediator.  Cramer Decl. ¶ 25.  More recently, in late 2013, after the close of fact and expert discovery, with the Court's two-day hearing on the parties' *Daubert* motions having been held, and with the class certification hearing looming, the parties agreed to private mediation with Professor Eric Green, a nationally-recognized mediator experienced with complex antitrust class actions.  *Id.* ¶ 26.  The parties held a full-day mediation with Professor Green on December 5, 2013 in New York, which initially proved unsuccessful.  *Id.*

Following the mediation session, certain of the parties continued to negotiate throughout December 2013, culminating in an agreement under which Comdata and Ceridian would make a combined cash payment of $100 million to Plaintiffs and to the Settlement Class, along with Comdata's agreement to certain prospective relief.  Cramer Decl. ¶ 26.  On December 31, 2013, Plaintiffs, Comdata, and Ceridian entered into a memorandum of understanding ("MOU"), memorializing the settlement between Plaintiffs and the Settlement Class, on the one hand, and Comdata and Ceridian, on the other.  *Id.*  Contemporaneous with these negotiations, and with Professor Green's assistance, Plaintiffs and Love's negotiated a MOU, signed January 3, 2014, whereby Love's would pay the Settlement Class $10 million.  *Id.*

On January 9, 2014, the Court held a settlement conference with Plaintiffs and the then-non-settling TA and Pilot Defendants.  Cramer Decl. ¶ 26.  During that conference, the Court and counsel for the TA and Pilot Defendants engaged in further settlement discussions.  Following that conference, Plaintiffs and the TA and Pilot Defendants entered into a MOU under which the TA and Pilot Defendants each agreed to pay $10 million to the Settlement Class (*i.e.*, $20 million combined), bringing the total cash value of the Settlement to $130 million.  *Id.*

Throughout January and February of this year, Plaintiffs and Defendants exchanged several drafts of the Settlement Agreement—including numerous attachments such as the Long Form Notice, Publication Notice, Proposed Preliminary Approval Order and Claim Form—vigorously negotiating its terms and the wording of the various attachments.  Cramer Decl. ¶ 26.  On March 3, 2014, all parties entered into the Definitive Master Settlement Agreement that provides for a collective $130 million cash payment to the Settlement Class in addition to valuable prospective relief from Comdata.  Subsequent to the Court's certifying the Settlement Class and granting Preliminary Approval of the Settlement [Dkt. 705], Defendants each deposited the agreed amounts into escrow accounts for the benefit of the Settlement Class, where the monies now sit, earning interest.  *Id.* at ¶ 31.  The Court-appointed escrow agent, Huntington National Bank, estimates that the interest earned on the escrow funds will amount to approximately $60,000 by the July 14, 2014 final fairness hearing.  *Id.*

The prospective relief portion of the Settlement includes a series of legally binding commitments from Comdata to refrain from including and enforcing certain provisions in its merchant services agreements.  These commitments, which will be in place for five years from certain specified trigger dates, are described in detail in the Settlement Agreement.  They include Comdata's commitment:

- not to enforce or include any contractual provisions preventing the Major Chains from actively steering customers to non-Comdata OTR Fleet Cards, including in-house accounts;

- not to enforce or include any contractual provisions preventing Settlement Class Members from actively steering customers to non-Comdata OTR Fleet Cards, including in-house accounts;

- not to enforce or include any provision in any agreement with Settlement Class Members requiring Settlement Class Members to offer Comdata cardholders the same discount offered to customers using other payment methods.  For instance, Settlement Class Members will not be precluded from offering across-the-board

discounts to customers using non-Comdata OTR Fleet Cards that are not offered to Comdata cardholders;

- not to include or enforce any provision requiring any Major Chain to pay to Comdata a transaction fee that is equal to or greater than the highest transaction fee paid by that Major Chain to any other competing OTR Fleet Card company ("Transaction Fee MFN") in any of its agreements;

- not to include a Transaction Fee MFN provision requiring Settlement Class Members to pay to Comdata a transaction fee that is equal to or greater than the highest transaction fee paid by that merchant to any other competing OTR Fleet Card company in any of its agreements;

- not to prohibit Settlement Class Members from surcharging the portions of its Comdata proprietary transactions in which the fee is calculated on a percentage basis, under certain conditions set forth in more detail in the Settlement Agreement; and

- to negotiate in good faith with four major Buying Groups—NATSN, PTP, AMBEST, and Roady's—with regard to reaching a commercially reasonable agreement on the rates and commercial terms for the processing of Comdata OTR Fleet Cards by merchant members of those Buying Groups, subject to certain conditions detailed in the Settlement Agreement.

Cramer Decl. ¶ 27.

Co-Lead Class Counsel asked Dr. Hal Singer—one of Plaintiffs' testimonial expert economists who was very familiar with the extensive record through his work on two reports submitted in the case—to conduct an economic valuation on the portion of the prospective relief pertaining to Comdata's contractual changes.  Relying upon the record evidence and standard economic methodologies, Dr. Singer opined that the value to the Settlement Class of Comdata's contractual changes falls between $260 million and $491 million.  *See* Corrected Decl. of Dr. Hal Singer in Support of Mot. for Preliminary Approval ("Singer Decl.") ¶ 3 [Dkt. 704].

The valuation is an estimate.  The Settlement Agreement, which sets forth in full the obligations of the parties under the Settlement, does not require Comdata to lower its fees to Settlement Class Members.  Nevertheless, Plaintiffs and their counsel believe—based on Dr. Singer's analysis and their own assessment of the importance of the changes Comdata has agreed

-8-

to make to the competitive landscape—that the combined value of the Settlement to the Settlement Class (*i.e.*, the cash portion plus the prospective relief) is between $390 million to $621 million.  This sum exceeds the overcharges Plaintiffs' expert estimated that the Settlement Class suffered due to the conduct challenged in the case.  Cramer Decl. ¶ 8.

### D.   The Court Certified the Settlement Class, Preliminarily Approved the Settlement, and Directed That Notice Be Issued to the Settlement Class.

On March 17, 2014, the Court certified the Settlement Class and preliminarily approved the Settlement.  Preliminary Approval Order ¶¶ 4-6.  The Court's certification of the Settlement Class was conditioned only "upon the entry of [the Preliminary Approval] Order and the Final Order and Final Judgment, and the occurrence of the Final Effective Date."  *Id.* ¶ 6.

The Court found that the Settlement "falls within the range of reasonableness" because of the cash award it provides, in addition to valuable prospective relief.  Preliminary Approval Order ¶ 6(g).  The Court further found that the Settlement has "key indicia of fairness" because the Settlement was the product of arm's length negotiations, was reached after extensive discovery, and is supported by Co-Lead Class Counsel, who are experienced in antitrust litigation.  *Id.*

### E.   Notice was Disseminated Through First-Class Mail, Publication in National Periodicals, and a Website.

At Co-Lead Class Counsel's direction, Rust Consulting ("Rust") implemented the three-pronged notice plan the Court ordered.  *See* Preliminary Approval Order ¶ 8.  Rust distributed the Long Form Notice by first-class mail to Settlement Class members using 8,711 unique names and addresses in the mailing database derived from Comdata's transaction database by Plaintiffs' economic consultant, Econ One, Inc.  *See* accompanying Decl. of Elizabeth Levine in Support of Pls.' Unopposed Mot. for Final Approval ("Levine Decl.") ¶¶ 6, 10.  Of that number, 1,919 were

-9-

returned undeliverable, for which Rust obtained new addresses and promptly re-mailed.  *Id.*

¶¶ 13, 14.  Ultimately, 1,849 notices were undeliverable. *Id.* ¶ 15.

With respect to the required Publication Notice, Rust published notice in the May 2014

edition of *NACS Magazine*, a monthly periodical sent to members of the National Association of

Convenience Stores.  Levine Decl. ¶ 17; *id.*, Ex. D (publication notice in *NACS Magazine*).

Plaintiffs and Rust chose *NACS Magazine* because it features content that focuses on business

trends, best practices, market research and legislative issues affecting the convenience store and

fuel retailing industry.  *Id.  NACS Magazine* has a monthly circulation of 28,631 recipients

through its print, online, and mobile versions.  *Id.*  Additionally, on April 14, 2014, Rust caused

an internet advertisement announcing the Settlement to appear on the website of the National

Association of Truck Stop Operators ("NATSO") and in NATSO's weekly e-mailed newsletter.

*Id.* ¶ 18; *id.*, Ex. E (internet advertisement on NATSO website and newsletter).

Finally, Rust established and maintained a website (located at

www.TruckStopAntitrustSettlement.com) and a toll-free telephone hotline to supplement the

Long Form Notice provided by first-class mail and Publication Notice.  Levine Decl. ¶¶ 19, 21.

The website received approximately 30,942 visits.  *Id.* ¶ 19.  The toll-free hotline, which was

staffed with operators prepared to answer Settlement Class Members' questions, received 978

calls.  *Id.* ¶ 21.  Additionally, Co-Lead Class Counsel fielded numerous calls from Settlement

Class Members, answering questions regarding the Claim filing process.

The deadline for Settlement Class Members to submit Claims was June 5, 2014.

Preliminary Approval Order ¶ 28(f).  Settlement Class Members were able to submit Claims by

mail or through the website.  Levine Decl. ¶ 20.  Rust has received 2,284 timely Claim Forms

and 4 late Claim Forms, which means that 33% of the 6,866 potential Settlement Class Members

filed Claims.  *Id.* ¶¶ 6, 24.  The Claims filed represent approximately 62% of the overcharges incurred by the Settlement Class.  *Id.*  ¶ 24.

III.   **ARGUMENT**

A.   **The Court Should Finally Approve the Settlement, Which Is Fair, Reasonable, Adequate, and in the Best Interest of the Settlement Class**

Under Federal Rule of Civil Procedure 23(e), a settlement must be "fair, reasonable and adequate" to be approved.  There is an "overriding public interest in settling class action litigation."  *In re Pet Food Prods. Lib. Litig.*, 629 F.3d 333, 351 (3d Cir. 2010) (citation omitted and internal quotation marks omitted).  The Third Circuit thus applies a "'strong presumption in favor of voluntary settlement agreements,'" which is "'especially strong in class actions and other complex . . . because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts."  *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 311 (3d Cir. 2011) (quoting *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594-95 (3d Cir. 2009)) (en banc).

Here, the Settlement is entitled to an initial presumption of fairness.  As noted above, the Court has already found that (1) the Settlement was the product of arm's-length negotiations "over a long period of time, involving an experienced private mediator as well as this Court," (2) "there was extensive discovery," and (3) "the proponents of the settlement are experienced in similar litigation."  Preliminary Approval Order ¶ 6(g).  Additionally, ***no*** Settlement Class Member objected ***or*** opted out.  Based on the Court's findings and the absence of any objection, the Settlement is presumed to be fair.  *See Sullivan*, 667 F.3d at 320 n.54 (noting that "'initial presumption of fairness' may apply where "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; (4) only a small fraction of the class objected") (citation and internal quotation marks

-11-

omitted); *see also In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003)

("A presumption of correctness is said to attach to a class settlement reached in arms-length

negotiations between experienced, capable counsel after meaningful discovery.") (citing

*Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997)).

This presumption of fairness is confirmed by the analysis that courts must apply in

evaluating class action settlements.  Courts in the Third Circuit must consider the nine so-called

*Girsh* factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction
> of the class to the settlement; (3) the stage of the proceedings and the amount of
> discovery completed; (4) the risks of establishing liability; (5) the risks of
> establishing damages; (6) the risks of maintaining the class action through the
> trial; (7) the ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best possible
> recovery; and (9) the range of reasonableness of the settlement fund to a possible
> recovery in light of all the attendant risks of litigation.

*Pet Food*, 629 F.3d at 350 (quoting *Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir. 1975)); *see also*

*Sullivan*, 667 F.3d at 319-20 (same).  While the Court "must make findings as to each of" these

factors, *id.* at 350, no one factor by itself is dispositive.  *Hall v. Best Buy Co., Inc.*, 274 F.R.D.

154, 169 (E.D. Pa. 2011).

In addition to the *Girsh* factors, courts should also consider a second set of factors,

known as the *Prudential* factors, insofar as they apply:

- the maturity of the underlying substantive issues, as measured by experience in
  adjudicating individual actions, the development of scientific knowledge, the
  extent of discovery on the merits, and other factors that bear on the ability to
  assess the probable outcome of a trial on the merits of liability and individual
  damages;

- the existence and probable outcome of claims by other classes and subclasses;

- the comparison between the results achieved by the settlement for individual class
  or subclass members and the results achieved—or likely to be achieved—for
  other claimants;

- whether class or subclass members are accorded the right to opt out of the settlement;

- whether any provisions for attorneys' fees are reasonable; and

- whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Pet Food*, 629 F.3d at 350 (citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 323 (3d Cir. 1998)); *see also Sullivan*, 667 F.3d at 320 (same).

While the Court is required to consider *Girsh* factors and, where applicable, the *Prudential* factors, "the professional judgment of counsel involved in the litigation" is, however, "entitled to significant weight." *Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985). Counsel should not be held to "an impossible standard, as a settlement is virtually always a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 179 (E.D. Pa. 2000) (citations, internal quotations omitted).

Here, the *Girsh* factors, the relevant *Prudential* factors, and the judgment of Co-Lead Class Counsel all favor final approval.

**1.  The *Girsh* Factors Weigh Heavily and Uniformly in Favor of Final Approval.**

**a.  The Complexity, Expense, and Likely Duration of the Litigation**

This first factor considers "the probable costs, in both time and money, of continued litigation." *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001) (citation and internal quotation marks omitted). With respect to this factor, courts have recognized that antitrust class actions are "'arguably the most complex action[s] to prosecute'" as "'[t]he legal and factual issues involved are always numerous and uncertain in outcome.'" *In re Auto. Refinishing Paint*

*Antitrust Litig.*, 617 F. Supp. 2d 336, 341 (E.D. Pa. 2007) (quoting *In re Linerboard Antitrust*

*Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003)); *see also In re Fasteners Antitrust Litig.*, No.

08-md-1912, 2014 U.S. Dist. LEXIS 8829, at *23 (E.D. Pa. Jan. 24, 2014).

      This case was no exception.  This litigation, which extended over seven years, has

required extensive briefing of complex legal and factual issues and exhaustive discovery efforts.

The extensive discovery efforts and motion practice in this case has included:

- the review, analysis, summary, and organization of millions of pages of documents produced by parties and third-parties during the course of this litigation and 2.3 terabytes of transaction data;

- over 70 depositions, including 9 expert witness depositions, throughout the United States;

- numerous third-party document subpoenas, which required extensive negotiations (particularly with Flying J, Inc., but also with many other third parties), resulting in the production of thousands of pages of documents;

- 29 sets of document requests, seven sets of interrogatories and seven sets of requests for admissions on Defendants, many of which were followed by an extensive meet and confer process;

- ten sets for documents requests and four sets of interrogatories directed at the Class Representatives;

- several discovery motions by the parties;

- Plaintiffs' proffer of three economic experts, who produced eight expert reports, and the deposition of Defendants' four experts and analysis of their seven expert reports;

- two rounds of motions to dismiss, which Plaintiffs opposed and defeated in substantial part;

- Plaintiffs' fully briefing a motion for class certification, which was scheduled for hearing on January 28-30, 2014;

- briefing and conducting argument on six *Daubert* motions and related motion to strike; and

- opposing Ceridian's summary judgment motion, which was soon-to-be
  followed by summary judgment motions by the other Defendant
  groups.

Cramer Decl. ¶¶ 19-24.

As the Court's records reflect, by the time of Settlement, Plaintiffs had already undertaken a substantial amount of work, expending thousands of hours and advancing millions of dollars without the promise of compensation, over their seven-year prosecution of this case. However, had the parties not settled, more work was forthcoming. Summary judgment briefing was scheduled to commence on May 3, 2014 and, as noted above, trial was scheduled to begin in August 2014, which would have entailed extensive pretrial briefing and preparation, including the marshaling and presentation of a voluminous evidentiary record. Moreover, even after trial was concluded, there would likely be one or more lengthy appeals. The prospect of a lengthy, complicated trial and subsequent appeals make the Settlement all-the-more appropriate. *See In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 269 (E.D. Pa. 2012) (finding settlement favorable where "considerable expenditures of financial resources and hours of attorney time relating to discovery for liability and damages" would be required for trial); *In re Ikon Office Solutions, Inc., Secs. Litig.*, 194 F.R.D. 166, 179 (E.D. Pa. 2000) ("Finally, the extremely large sums of money at issue almost guarantee that any outcome, whether by summary judgment or trial, would be appealed. This factor thus weighs in favor of the proposed settlement.").

This case has spanned seven years and, had the parties not settled, could have gone on for several more and entailed extensive pretrial motion practice, a complicated trial, and numerous post-trial motions and appeals. The parties' Settlement grants Settlement Class Members relief immediately. The first *Girsh* factor thus "weighs strongly in favor of the Settlement." *In re Ins.*

-15-

*Brokerage Antitrust Litig.*, 297 F.R.D. 136, 145 (D.N.J. 2013) (citing *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535-36 (3d Cir. 2004)).

### b.     The Reaction of the Class to the Settlement

The second *Girsh* factor also favors final approval.  Each Class Representative, all of which monitored this case closely, supports the Settlement.[8]  Having reviewed the terms of the Settlement, each Class Representative believes that the Settlement's provision of $130 million in cash and valuable prospective relief (which Dr. Singer valued at $260 million to $491 million) will provide significant benefits to Settlement Class Members.[9]  For instance, William "Pat" Marchbanks, owner of Plaintiff Marchbanks Truck Service, Inc., closely followed the prosecution of this lawsuit and the settlement negotiations, like his fellow owners.  In his opinion, "[t]he Settlement will bring substantial benefits to the Settlement Class."  Marchbanks Decl. ¶ 15.

Settlement Class Members agree, responding in an unambiguously positive fashion.  There have not been any objections to the Settlement, and no Settlement Class Member has opted out.  Moreover, 33% of the Settlement Class has filed Claims, which amount to approximately 62% of the overcharges incurred by the Settlement Class.  Such indicators of Settlement Class Member approval are coupled with the express, unanimous support of leaders of four independent Truck Stop Buying Groups, each of which have voiced their support on behalf of their memberships for final approval of the Settlement.  *See* Rhinehart Decl. ¶ 4; Newman Decl. ¶ 4; Allen Decl. ¶ 4; Bird Decl. ¶ 4 [Dkt. 707-4].  As with his other Buying Group leaders, President and General Manager of Professional Transportation Partners ("PTP")

---

[8] Marchbanks Decl. ¶ 12; Silverman Decl. ¶ 8; Rosenfarb Decl. ¶ 10; Krachey Decl. ¶ 8.

[9] Marchbanks Decl. ¶¶ 9-10; Silverman Decl. ¶¶ 9-10; Rosenfarb Decl. ¶¶ 11-12; Krachey Decl. ¶¶ 9-10.

Burt Newman, Sr., found that the Settlement will bring "substantial value to Independent Truck Stops" and "is clearly in the interests of PTP member truck stops and the Independent truck stop business[] more generally."  Newman Decl. ¶¶ 5, 7.

As noted above, the absence of any objections or opt-outs from a class "is a rare phenomenon," particularly where, as here, there are sophisticated class members.  *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 305.  Settlement Class Members' approval, combined with the four unambiguous sworn declarations supporting the Settlement by the Buying Group representatives, strongly favor a finding that the Settlement is fair, reasonable, and adequate.  *In re Fasteners*, 2014 U.S. Dist. LEXIS 8829, at *25 (finding that second *Girsh* factor "weighs strongly in favor of finding the settlements fair, reasonable, and adequate" where no class member objected).

### c.       The Stage of the Proceedings and the Amount of Discovery Completed

The third *Girsh* factor likewise weighs in favor of final approval.  Courts use the procedural stage of a case at the time of settlement as a lens through which to assess whether counsel adequately appreciated the merits of the case before negotiating that settlement.  *Warfarin,* 391 F.3d at 537 (citations omitted). "[C]ourts generally recognize that a proposed class action settlement is presumptively valid where . . . the parties engaged in arm's length negotiations after meaningful discovery."  *Cullen v. Whitman Med Corp.*, 197 F.R.D. 136, 144-45 (E.D. Pa. 2000) .  Settlements reached after discovery "are more likely to reflect the true value of the claim."  *Boone v. City of Phila.*, 668 F. Supp. 2d 693, 712 (E.D. Pa. 2009) (citing *Bell Atl. Corp. v. Bolger,* 2 F.3d 1304, 1314 (3d Cir. 1993)).

Here, the parties agreed to settle seven years into the case, following extensive discovery and motion practice.  As noted above, the parties took over 70 depositions and reviewed hundreds of thousands of pages of party and third-party documents.   Plaintiffs retained three

-17-

expert economists, while Defendants retained four experts, all of whom issued reports and were deposed.  The parties settled after discovery closed and shortly before the Court's scheduled hearing on Plaintiffs' Class Certification Motion, which entailed extensive briefing detailing Plaintiffs' theories of the case and Defendants' defenses.

When they agreed to the Settlement, Plaintiffs had "a full appreciation of the merits of the case as well as the legal theories and risks."  *Pet Food*, 629 F.3d at 351.  The third *Girsh* factor thus also weighs heavily in favor of final approval.

### d.    The Risks of Establishing Liability and Damages

The fourth and fifth *Girsh* factors also favor finding that the Settlement was fair, reasonable, and adequate.  The fourth factor "examine[s] what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them."  *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 814 (3d Cir. 1995).  The fifth factor, like the fourth, "attempts to measure the expected value of litigating the action rather than settling it at the current time."  *Cendant*, 264 F.3d at 238-39 (*quoting GMC*, 55 F.3d at 816).  In considering these factors, "the Court need not delve into the intricacies of the merits of each side's arguments, but rather may 'give credence to the estimation of the probability of success proffered by [Appointed Counsel], who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action.'"  *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 115 (E.D. Pa. 2004) (*quoting Lachance v. Harrington*, 965 F. Supp. 630, 638 (E.D. Pa. 1997)).

While Co-Lead Class Counsel believe that they would prevail at trial in showing that Defendants were liable, based on the extensive evidentiary record, they recognize that class action cases, like all complex litigation against large companies with teams of highly talented defense counsel, have inherent risks.  "Here, as in every case, Plaintiffs face the general risk that

-18-

they may lose at trial, since no one can predict the way in which a jury will resolve disputed issues."  *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 337 (W.D. Pa. 1997).  Thus, Third Circuit district courts have granted final approval to antitrust class action settlements where, "[a]s in any antitrust case, [there are] substantial risks of non-recovery, even after preliminary victories were achieved."  *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 400 (D.N.J. 2006); *see also In re Remeron End-Payor Antitrust Litig.*, No. 02-2007 (FSH), 2005 U.S. Dist. LEXIS 27011, at *70 (D.N.J. Sept. 13, 2005) (stating that, in light of risks of no recovery, antitrust class action settlement "may be approved even if the settlement amounts to a small percentage of the single damages sought").

With respect to proving damages, although similarly confident, Co-Lead Class Counsel recognized the genuine risk of no recovery or only a limited recovery.  *See, e.g.*, *In re Elec. Carbon Prods.*, 447 F. Supp. 2d at 401 (noting risks in proving antitrust damages at trial, which depends on "a battle of experts addressing the measurement of . . . overcharges, which can become an esoteric exercise with unpredictable results"); *Sutton v. Medical Serv. Ass'n*, No. 92-4787, 1994 U.S. Dist. LEXIS 7512, at *18 (E.D. Pa. June 8, 1994) (granting final approval, noting that "even assuming that plaintiffs ultimately would have prevailed on liability, they faced the risk that they could not establish damages or obtain the other prospective relief that is achieved by this Settlement Agreement").  The Settlement, on the other hand, provides Settlement Class Members with certain and immediate benefits.

### e.    The Risks of Maintaining the Class Action through Trial

The sixth *Girsh* factor also favors the Settlement.  Plaintiffs' Motion for Class Certification was pending at the time the Settlement was reached.  Plaintiffs believe that, based on the strong evidentiary record they presented the Court, class certification was and is warranted.

-19-

While Plaintiffs did not foresee any reason that a class would not have been certified for litigation purposes, a court may decertify or modify a class action at any time if it proves to be unmanageable. *See Prudential*, 148 F.3d at 321 (noting that "a district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable"). Because of this ever-present risk, courts have generally found the sixth *Girsh* factor to favor final approval of settlements. *Egg. Prods.*, 284 F.R.D. at 273 ("The Court of Appeals for the Third Circuit has recognized: There will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement.") (citation and internal quotation marks omitted).

**f.      The Ability of Defendants to Withstand a Greater Judgment**

The seventh *Girsh* factor is neutral here. The ability of a defendant to withstand a greater judgment is most relevant in cases where the amount of the settlement is less than might ordinarily be agreed upon by the plaintiffs because the defendant's financial circumstances cannot accommodate a higher payment. *Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011). Such circumstances may not exist here because there is no evidence in the record that Defendants are financially unstable. *Id.* at 254 (finding factor neutral where there was no reason to believe that "Defendants face any financial instability")

Moreover, courts have recognized that whether the defendant would have had the resources to pay more in settlement is not relevant where considered only in a vacuum, divorced from considerations of whether the settlement is fair in light of the legal issues and circumstances involved in the case. *See Warfarin*, 391 F.3d at 538. This case involved many difficult legal issues and presented substantial risks, and Plaintiffs would be required to spend substantial additional time and expenses pursuing the case to its ultimate end. The Settlement—valued in excess of what Plaintiffs' expert estimated to be Plaintiffs' total damages—that

-20-

Plaintiffs obtained is an excellent benefit on its face, and an even better result when these considerations are taken into account.  The theoretical ability of Defendants to pay more, considered absent this context, is not relevant to determining the reasonableness of this Settlement.  *See id.*; *see also Lazy Oil*, 95 F. Supp. 2d at 318 ("The Court presumes that Defendants have the financial resources to pay a larger judgment.  However, in light of the risks that Plaintiffs would not be able to achieve any greater recovery at trial, the Court accords this factor little weight in deciding whether to approve the proposed Settlement."); *Perry*, 229 F.R.D. at 116 ("[Defendant] could certainly withstand a much larger judgment as it has considerable assets.  While that fact weighs against approving the settlement, this factor's importance is lessened by the obstacles the class would face in establishing liability and damages.").

> **g.**    **The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation**

In combination, the final two *Girsh* factors assess "whether the settlement represents a good value for a weak case or a poor value for a strong case."  *Warfarin,* 391 F.3d at 538.  They "test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial."  *Id.* (citing *Prudential*, 148 F. 3d at 322).

Assessment of a settlement, however, need not be tied to an exact formula.  *See Prudential*, 148 F.3d at 322.  The Third Circuit has cautioned against demands that a settlement approach the maximum possible recovery, noting that a settlement is, after all, a compromise.  *Id.* at 316-17.  Accordingly, a settlement may still be within a reasonable range, even though it represents only a fraction of the potential recovery.  *Cullen,* 197 F.R.D. at 144; *see also Fisher Bros.,* 604 F. Supp. at 451 ("The court must review a settlement to determine whether it falls

-21-

within a 'range of reasonableness,' not whether it is the most favorable possible result of litigation.") (internal citations omitted).

Here, the Settlement falls well beyond the range of settlements that are worthy of final approval as fair, reasonable, and adequate.  The Settlement's value has been estimated at being between $390 million and $621 million, including a cash payment of $130 million and meaningful prospective relief including Comdata's commitment not to enforce those portions of Comdata's merchant services agreements that Plaintiffs had challenged in this case as being anticompetitive.  As noted above, the Settlement's estimated value exceeds the projected overcharge of $350 million to $390 million that Dr. Leitzinger opined that the Settlement Class suffered based on Defendants' conduct.  Cramer Decl. ¶ 8.  This comparison further confirms that the Settlement constitutes a "good value" for this case.

2.    <strong>The Relevant <em>Prudential</em> Factors Likewise Favor Final Approval</strong>

a.    <strong>Factors That Bear on the Maturity of the Underlying Substantive Issues</strong>

As discussed above, this case was settled after the completion of the discovery, after the parties' completed briefing on their respective legal positions, and after hard-fought settlement negotiations.  That the underlying substantive issues were well-developed further supports approval of this settlement.  *See Chakejian v. Equifax Info. Servs.*, 275 F.R.D. 201, 215 (E.D. Pa. 2011) (finding that where the underlying substantive issues were "mature in light of the experience of the attorneys, extent of discovery, posture of the case, and mediation efforts undertaken," this factor supported approval of the settlement); *In re Fasteners*, 2014 U.S. Dist. LEXIS 8829, at *30-31 ("A substantial amount of information has been provided to Settlement Class Counsel such that counsel are capable of making an informed decision about the merits of the case if it were to proceed  to trial, and about the fairness of the settlement terms.").

-22-

   **b.**  <u>**Whether Class or Subclass Members Are Accorded the Right**</u>
      <u>**to Opt Out of the Settlement**</u>

As discussed above, members of the Settlement Class were given the opportunity to opt

out of the Settlement Class, and despite a class comprised of many thousands of businesses ***not a***

***single Truck Stop or Retail Fueling Facility in the requested exclusion***.  The fact that no opt-

out requests were filed also heavily favors final approval.  *In re Fasteners*, 2014 U.S. Dist.

LEXIS 8829, at *31 (finding it "significant" that, despite being given the opportunity to opt out,

only one class member did so).

   **c.**  <u>**Whether Any Provisions for Attorneys' Fees Are Reasonable**</u>

Plaintiffs seek one-third of the $130 million cash value of the Aggregate Settlement Fund

as attorneys' fees ($43,333,333.33), $6,696,856.98 as reimbursement for litigation expenses, and

$315,000 in total incentive awards for the Class Representatives.  *See* Pls.' Unopposed Mot. for

an Award of Attorneys' Fees, Reimbursement of Expenses, & Payment of Service Awards to the

Class Representatives ("Attys.' Fees Mot.") at 1 [Dkt. 707].  While Plaintiffs request one-third of

the cash value of the Aggregate Settlement Fund as attorneys' fees, when the estimated total

value of the Settlement is considered (*i.e.*, including prospective relief), Plaintiffs' fees request

amounts to only 11.1% of the Settlement's value, using the most conservative estimate.  With

respect to the reasonableness of these requests, Plaintiffs incorporate by reference their

unopposed Motion for Attorneys' Fees and the supporting brief, declarations, and exhibits,

which were filed on May 12, 2014.  *Id.*  For the reasons set forth therein, the attorneys' fees and

costs sought by counsel are within accepted ranges and reasonable.

   **d.**  <u>**Whether the Procedure for Processing Individual Claims**</u>
      <u>**under the Settlement is Fair and Reasonable**</u>

Each Settlement Class Member has received a Claim Form, which shows the amount they

are estimated to receive under the Settlement.  *See* Ex. C, Levine Decl. (example of Claim

-23-

Form).  The Long Form Notice, Claim Form, and other materials have also been made available

at www.truckstopantitrustsettlement.com, the website dedicated to the Settlement and maintained

by Rust, the court-appointed claims administrator.

Under the Preliminary Approval Order, Settlement Class Members were required to

submit their Claim Forms, either by first-class mail or through the website, on or before June 5,

2014.  Preliminary Approval Order ¶ 28(f).  The claims process has proceeded smoothly.  Rust

received 2,284 timely completed Claims, reflecting approximately 62% of the overcharges

incurred by Settlement Class Members.  Levine Decl. ¶ 24.  As it processes claims, Rust is

contacting Settlement Class Members in the event any questions arise.  *Id.* ¶ 25.

### B.    Plaintiffs' Proposed Plan of Allocation and Distribution is Fair, Reasonable, and Adequate

Like approval of the amount of the settlement, the proposed plan of allocation must be

fair, reasonable, and adequate.  *Mehling v. N.Y. Life Ins. Co.*, 248 F.R.D. 455, 463 (E.D. Pa.

2008) (citing *In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000)).  Generally,

an allocation plan is reasonable if it reimburses class members based on the type and extent of

their injuries.  *Id.*

Plaintiffs' proposed Plan of Administration and Distribution is fair, reasonable, and

adequate because it will pay Settlement Class Members who submit valid Claim Forms

("Claimants") a *pro rata* share of the Net Settlement Fund[10] that is based on the amount each

Claimant was allegedly overcharged due to the conduct challenged in the case.  *See* Settlement

Agreement, Ex. E.  Each Claimant's *pro rata* share will be calculated using transactional data

provided by Comdata, which has at least two advantages.  First, because all of the data will come

---

[10] The Net Settlement Fund consists of the Settlement proceeds, inclusive of any interest and net
of Court-approved attorneys' fees, Class Representative service awards, and costs of litigation
and settlement administration.

from the same source rather than hundreds or thousands of different sources all sorted and presented differently, the opportunities for error will be substantially reduced.  Second, the burdens on the Claimants are substantially ameliorated as Claimants need not search old computers or paper files for transaction records in order to submit a valid claim.

Each Claimant's initial, estimated *pro rata* share, as shown on the Claim Form, was determined in part based on a calculation estimating the amount each Claimant paid above what Plaintiffs' claim was a competitive rate using a modified damages model developed by Plaintiffs' expert Dr. Jeffrey Leitzinger, who submitted four expert reports in this litigation.  To estimate the amount each Claimant was overcharged, Dr. Leitzinger's calculation used a benchmark approach, which set a benchmark for the fees that Settlement Class Members would have paid absent the challenged conduct.  The benchmark used to estimate Claimants' recovery was the TCH Benchmark that Dr. Leitzinger developed in his expert reports.[11]  Based on record evidence, Dr. Leitzinger opined that TCH, a rival OTR Fleet Card provider, was a formidable threat to Comdata during a large portion of the relevant period.[12]  The overcharge damage on each transaction, then, was the difference between the fees paid by each Claimant on each transaction processed at a percentage fee and the $1 benchmark fee that TCH charged.  To compute the overcharges of any one Claimant, Dr. Leitzinger or his colleagues at Econ One, for all transaction fees a Claimant paid to Comdata that were above $1, took the sum of the per transaction overcharges (*i.e.*, the difference between the transaction fee paid and $1) by each Claimant over the course of the Settlement Class Period.

---

[11] *See* Leitzinger Rpt. ¶¶ 126-128, 133-135 [Dkt. 163]; Leitzinger Supp. Rpt. ¶¶ 56-58 [Dkt. 671].

[12] Dr. Leitzinger concluded that in a world absent the challenged conduct—where, in his view, OTR Fleet  Card issuers would have used lower merchant fees to encourage truck stops to steer business to  their networks—adopting a pricing strategy similar to TCH (which had charged a flat $1 fee for  most of the relevant period) would have been competitively advantageous.

-25-

The amount of money actually received by each Claimant will depend on the number of valid Claims, the total overcharges sought in those Claims, and the amount of the Net Settlement Fund.  Because less than 100% of the Settlement Class has submitted a valid Claim Form, and none of the Net Settlement Fund reverts to the Defendants, each Claimant's relative share will be larger.  To compute each Claimant's *pro rata* share, Dr. Leitzinger will take the total overcharge computation for each Claimant using the above method and divide that by the sum of all overcharges computed for all Claimants.  The result of that computation will be each Claimant's *pro rata* share of the Net Settlement Fund.  The result of that computation for each Claimant will then be multiplied by the Net Settlement Fund amount to determine each Claimant's actual total dollar recovery.

For all valid claims, with the assistance of Dr. Leitzinger and Econ One, Rust has: (a) identified the Comdata Proprietary Transactions in which the Claimant paid a percentage-based Merchant Transaction Fee of greater than $1 during the Settlement Class Period; (b) determined the Comdata Merchant Transaction Fees in dollars paid by the Claimant on each of those transactions; (c) subtracted $1 (the TCH benchmark fee) from the Claimant's Merchant Transaction Fee for each of the Claimant's Comdata Proprietary Transactions during the Settlement Class Period to calculate an overcharge for each of the Claimant's qualifying Comdata Proprietary Transactions; (d) added up the total overcharges on all qualifying Comdata Proprietary Transactions made by each Claimant during the Settlement Class Period; (e) calculated each Claimant's percentage share of the total overcharges by dividing each Claimant's overcharges by the total combined overcharges paid by all Claimants; and then (f) multiplied each Claimant's percentage share of the total overcharges by the total dollars in the Net Settlement Fund.

For illustrative purposes, take a Claimant for whom Comdata's transaction database shows that it processed 10,100 Comdata Proprietary Transactions as a percentage of the dollar amount of the transaction during the Settlement Class Period.  Assume, for this example, that 10,000 of these transactions incurred transaction fees of $10 per transaction—*e.g.*, purchases of 100 gallons of diesel priced at $4 per gallon, for a total purchase amount of $400, with a 2.5% transaction fee on each transaction (0.25 x $400 = $10.00). These 10,000 transactions would thus be identified as transactions with percentage-based transaction fees of greater than $1, and included in the computation (*i.e.*, (a) above).

Assume that 100 of the transactions, however, incurred transaction fees of just $0.50 per transaction—*e.g.*, purchases of 5 gallons of fuel at $4 per gallon, for a total purchase amount of $20, with a 2.5% transaction fee on each transaction. These 100 transactions would thus fall below the $1 threshold, and, as a result, would be disregarded because they incurred no overcharge.

Next, Dr. Leitzinger will determine the dollar value of the percentage fees paid on each of the Claimant's Comdata Proprietary Transactions, which in this example is $10 (*i.e.*, (b) above).  Dr. Leitzinger will then subtract the TCH Benchmark fee ($1) from the transaction fee paid by the Claimant on each Proprietary Transaction, here a $9 ($10-$1) overcharge per transaction (*i.e.*, (c) above). The Claimant's total overcharges would then be calculated by adding up all of the Claimant's per-transaction overcharges across all of the Claimant's Proprietary Transactions (*i.e.*, (d) above).  In this example, the Claimant's total overcharges would be $90,000 ($9 x 100,000 transactions).

To get this exemplar Claimant's *pro rata* share of the Net Settlement Fund, the Claimant's overcharge ($90,000) would then be divided by the total overcharges computed for

-27-

all valid Claimants using this same method: assume $200 million for these purposes. That would yield a *pro rata* distribution percentage share of the Net Settlement Fund for this exemplar Claimant of 0.045% (*i.e.*, (e) above, where 0.045% = $90,000/$200,000,000.00).

Finally, to arrive at the total distribution amount in dollars for this exemplar Claimant, the Claimant's share would be multiplied by the total dollar amount of the Net Settlement Fund.  If the Net Settlement Fund was $80 million, then this Claimant would receive 0.045% (its pro-rata share) of $80 million or $36,000.00.

The estimated *pro rata* share for each Claimant, conservatively assuming that 100% of all Settlement Class Members would submit valid Claims, and the corresponding estimated dollar recovery for each Settlement Class Member calculated using the methods above, were set forth in the Claim Form made available to each Claimant.  However, because the Claims filed reflect approximately 62% of the total overcharges the Settlement Class incurred, Levine Decl. ¶ 24, Claimants will actually enjoy a larger recovery than the estimate set forth in the Claim Form.  As an example, the hypothetical Claimant above, assuming a 62.098% claim rate, would receive a recovery of $57,972.88 ([1/.62098] x 36,000) instead of $36,000.00.

This Plan of Administration and Distribution is fair, reasonable, and adequate.  Not a single Class Member objected to it.  It should be finally approved.

### C.   Adequate Notice Was Provided to the Class Consistent With the Court's Order Preliminarily Approving the Settlement

The due process requirements of the Fifth Amendment and the Federal Rules of Civil Procedure require that adequate notice of a proposed settlement be given to the Settlement Class Members. *Nichols v. SmithKline Beecham Corp.*, No. 00-6222, 2005 U.S. Dist. LEXIS 7061, at *27 (E.D. Pa. Apr. 22, 2005); Fed. R. Civ. P. 23(e).  "The Rule 23(e) notice is designed to summarize the litigation and the settlement and to apprise class members of the right and

-28-

opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *Prudential*, 148 F.3d at 327 (citation and internal quotation marks omitted).  The Fifth Amendment's due process requirements are satisfied by the "combination of reasonable notice, the opportunity to be heard and the opportunity to withdraw from the class." *Id.* at 306.

Here, the Court ordered a three-pronged Notice plan that employed notice by first-class mail and publication notice, along with a website through which Settlement Class Members could obtain information.  Preliminary Approval Order ¶ 8.  The Court found this plan to meet the "requirements of due process" and "Rule 23(e) of the Federal Rules of Civil Procedure."  *Id.* ¶ 9.  Rust, at Co-Lead Class Counsel's direction, implemented the Court-approved Notice plan, thereby satisfying due process and Rule 23(e). *Chakejian,* 2011 U.S. Dist. LEXIS 63455, at *11; *Careccio v. BMW of N. Am. LLC*, No. 08-2619, 2010 U.S. Dist. LEXIS 42063, at *26 (D.N.J. Apr. 29, 2010); *see also Comer v. Life Ins. Co.*, No. 08-cv-228-JFA, 2011 U.S. Dist. LEXIS 36042, at *4 (D.S.C. Mar. 31, 2011) (notice by first-class mail alone found sufficient, where identity of 84 class members was readily ascertainable from defendant's records).

The content of the Notice was sufficiently clear, detailed, and instructive to satisfy due process.  *See* Ex. C, Levine Decl. Among other things, the Notice informed Settlement Class Members of the claims involved in this case; the terms of the Settlement; the definition of the Settlement Class and Settlement Class Period; the requests for attorneys' fees, reimbursement of costs, and service awards;[13] the date and location of the final fairness hearing; the opportunity to

---

[13] The amounts of attorneys' fees, costs, and service awards requested is consistent with the amounts stated in the Long Form Notice.  *Compare* Attys.' Fees Mot. at 1 (requesting one-third of the $130 million cash value of the Aggregate Settlement Fund as fees ($43,333,333), $6,696,856.98 as reimbursement for litigation expenses, and $315,000 in incentive awards) *with* Ex. B at 9, Levine Decl ("If the Court approves the settlement, the Court will be asked to approve a fee to the lawyers of one-third of the Settlement Fund (including accrued interest) plus reimbursement to the lawyers for the six to seven and one-half million dollars in costs and

attend and speak at the hearing; the opportunity to object; the role of Co-Lead Class Counsel; and how to obtain additional information.  *See Prudential,* 148 F.3d at 328; *Nichols,* 2005 U.S. Dist. LEXIS 7061, at *30-31.  While 1,919 Notices were initially returned as undeliverable, Rust obtained updated addresses for those Settlement Class Members and promptly re-mailed those Notices.  Levine Decl. ¶¶ 13, 14.

> **D.**  **The Notice Requirements Of The Class Action Fairness Act Have Been Satisfied**

The Class Action Fairness Act, 28 U.S.C. § 1715, *et seq.*, requires each Defendant to notify appropriate State and Federal official of the proposed settlement.  No sooner than 90 days after notification, the Court may enter an order granting approval of the settlement.  28 U.S.C. § 1715(d).  Here, on behalf of all Defendants, Comdata provided notice of the proposed settlement to the appropriate State and Federal officials on March 13, 2014.  *See* Levine Decl. ¶ 4.  The ninety day period has run, and the Settlement may thus be approved.

**IV.**  **CONCLUSION**

For the reasons detailed above, and in other supporting documents, including the Declaration of Eric L. Cramer, Esq., the accompanying Declaration of Elizabeth Levine, the declarations of each of the Class Representatives, and the declarations from representatives from the four independent Buying Group consisting of hundreds of Settlement Class Members, Plaintiffs respectfully request that the Court enter the proposed Order and proposed Final Judgment, which, among other things, grants final approval to the Settlement pursuant to Federal Rule of Civil Procedure 23(e), and dismiss the claims with prejudice against Defendants.

---

expenses they have expended in connection with the Action to the extent that they can show the Court that these requests are reasonable and fair.  Plaintiffs' Class Counsel also will apply for incentive or service awards to the Plaintiffs for their services to the Class in the seven year pendency of this case in the following amounts: $150,000 to Marchbanks Truck Service, Inc. d/b/a Bear Mountain Travel Stop, $75,000 to Gerald F. Krachey d/b/a Krachey's BP South, $75,000 to Walt Whitman Truck Stop, Inc., and $15,000 to Mahwah Fuel Stop.")

-30-

Respectfully Submitted,


Dated:  June 16, 2014          */s/ Eric B. Fastiff*

Eric L. Cramer
Andrew C. Curley
BERGER & MONTAGUE, P.C.
1622 Locust St.
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

Eric B. Fastiff
Dean M. Harvey
Marc A. Pilotin
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery St., 29th Floor
San Francisco, CA 94111-3399
Tel: (415) 956-1100
Fax: (415) 956-1008

Stephen R. Neuwirth
Dale H. Oliver
Jeffrey G. Shandel
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
Tel: (212) 849-7000

*Co-Lead Counsel for Plaintiffs*

-31-

1180563.1